TJOFLAT, Circuit Judge,
concurring:
I write separately only to underscore the extent of the misrepresentations committed by the defendants and to make a broader point about “clarity” — the two issues most troubling the dissent.
One particular passage in the dissent contains the essence of the dispute in this case: “The fact of the matter is, in options, you are either going to lose big or win big — that is why brokerage firms like RFJCO can advertise potential profits of up to 200 to 300% and must also warn that this type of investment involves a high risk of loss (only investment capital should be used).” The dissent evidently feels that by proclaiming that only “investment capital should be used,” together with an equally generic disclaimer, a reasonable investor should be put on notice that commodities trading is extraordinarily volatile and the risk of loss enormous. Recognizing that “[cjommodities brokerage firms need to disclose both the potential and risks involved in options trading,” the dissent concludes that “RFCO does just that — disclosing the appropriate amount of profit potential as well as the adequate amount of risk.”
The crux of my disagreement with the dissent, then, lies in the necessary congruence between claims of potential profit and the concomitant risk involved. The dissent evidently believes that commodities brokerage firms can advertise about enormous profits (replete with constant repetition, explanation points, and satellite photographs of hurricanes) while making brief mention of the risk involved — a discussion of risk sugar-coated with assertions about how this risk can be “limited” while still providing “unlimited profit potential.” In my view, such lopsided advertising is hardly a disclosure of the “the adequate amount of risk” as the dissent proclaims. It certainly failed to convey the magnitude of the risk involved (remember: 95% of the firm’s clientele lost money on the advertised investments).
The deception regarding the substantial risk was compounded with more deception about how, precisely, the potential gains were going to be realized. The discussion about El Niño and urgency in the timing of the investment created an air of inevitability — as if the defendant had some spe *1336 cial knowledge with which to exploit an asymmetry of information in the market. All of this is fine, the dissent argues, so long as the advertiser skirts the line by peppering his language with conditional language (“could” and “may”) and does not say that profits are absolutely inevitable. Viewed from the perspective of a reasonable investor — not an investment banker at Merrill Lynch or a futures specialist for ADM[1] — a misleading expectation of investment success can certainly be made even if conditional language is used. This misleading picture is exactly the sort that the defendants painted. Perhaps the dissent would rather have a world of caveat emptor: “If it is the case that investors ‘surely’ wanted to know [information about the past success of the defendants’ clients] before they invested, then why didn’t they ask?” says the dissent. But this is not the world Congress envisioned when it enacted the commodities laws.
The dissent further bemoans the lack of clarity in the law. While it is undoubtedly true that the terms chosen by Congress— “defraud” and “deceive” — lack the precision necessary to guide behavior in all transactions, this “problem” is a necessary byproduct of the inherent difficulty in legal drafting. Language of general applicability — the stuff of statutes and common law rules — is simply incapable of conveying the entire range of permissible and impermissible conduct. The law is replete with nebulous phrases such as “proximate cause” and “rule of reason.” Some cases may entail post hoc judicial refinement, resulting in the unavoidable problem of a civil defendant without notice that his precise conduct could result in liability.
Whatever problems may be created by nebulous rules, I am confident that in this case, the defendants had ample notice that their heavily unbalanced portrait of options trading — a picture far different from reality — was impermissible. When an investor seeks to invest his money, he is principally concerned with two factors: return and risk. A rational investor with no peculiar aversion to risk would be indifferent between having $5 and a one-in-ten chance at winning $50. Change the risk factor to one-in-eighty and the bet becomes unattractive even to the most risk-seeking individual. The defendants in this case knew that by trumpeting enormous returns and downplaying the risk involved, a reasonable (if unsophisticated) investor would be enticed to make a bet that he would not otherwise make were the full picture disclosed. As the majority opinion points out, “it is misleading and deceptive to speak of ‘limited risk’ and ’200-300’ percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money.” Don’t make an active attempt to instill in the investor a grossly inaccurate picture of the risk-to-reward ratio. That is the rule in this case' — a rule I find to be abundantly clear.

. The advertisement in this case was obviously aimed at the novice commodities investor.